881 P.2d 690

**Wallace G. SHARTS and Stakeout Properties, Inc., Plaintiffs–Appellees,**

v.

**Stephen NATELSON and Natelson & Ross, Defendants–Appellants.**

No. 12121.

Court of Appeals of New Mexico.

June 30, 1993.

Certiorari Granted Sept. 19, 1993.

See also 759 P.2d 201.

Richard C. Bosson, Bosson & Canepa, P.A., Santa Fe, for plaintiffs-appellees.

Joseph J. Mullins, Charles K. Purcell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendants-appellants.

## OPINION

ALARID, Judge.

Wallace G. Sharts (hereinafter "Sharts") sued Stephen Natelson and Natelson and Ross (hereinafter "Natelson") for legal malpractice. Natelson moved for summary judgment on the basis that the action was barred by the four year statute of limitations, NMSA 1978, §§ 37-1-1 and -4 (Repl. Pamp.1990). Relying on *Jaramillo v. Hood,* 93 N.M. 433, 601 P.2d 66 (1979), the trial court denied the motion, finding a genuine issue of fact existed as to whether harm or loss in fact sufficient to accrue a cause of action in legal malpractice existed at a time which would make Sharts' claim vulnerable to the statute of limitations. The trial court certified its ruling for interlocutory appeal and this court granted the application. The question of law presented by this appeal is when may a trial court rule, as a matter of law, that harm or loss in fact exists sufficient for a cause of action in legal malpractice to accrue and begin the running of the four year limitation period provided by Sections 37-1-1 and -4. We affirm.

## I. FACTS

The pleadings, depositions, and exhibits establish that this case involves restrictive covenants Natelson drafted for property owned by Sharts. The property in question is a sixty-acre tract of land located in Taos County. Sharts contends he asked Natelson to draft restrictive covenants for a thirty-acre portion (Tract One) of the sixty-acre tract. The relevant portion of the covenants purported to restrict the size of the individual lots on Tract One to a three-acre minimum. Several lots within Tract One were acquired by individual purchasers after the restrictive covenants were recorded.

After the sale of these lots, Sharts decided to develop the remaining thirty acres (Tract Two) into a residential subdivision. He planned to divide Tract Two into half-acre lots. However, in May 1981, Sharts received a letter from an attorney threatening to take legal action to enforce the restrictive covenants on Tract Two which Sharts contended only governed Tract One. During 1983, while preparing to close loans for purchasers in the planned subdivision, a title company involved in the transactions informed Sharts that it interpreted the restrictive covenants as applying to both Tract One and Tract Two. Because the proposed subdivision lots were smaller than permitted in the restrictive covenants, the title company considered the covenants an impermissible cloud on the title of lots within Tract Two. Without title insurance, the bank refused to fund the loans. In addition, on approximately April 14, 1983, Sharts received a letter from attorneys for owners of lots in Tract One threatening to take legal action to enforce the three-acre lot restriction on Tract Two.

Between 1983 and 1984, to cure the problem, Natelson suggested that waivers and modifications of the restrictive covenants be obtained from purchasers of lots in Tract One. However, Natelson was unable to obtain the necessary waivers or modifications. Natelson then suggested that Sharts seek a declaratory judgment action establishing that the restrictive covenants did not apply to Tract Two. Sharts authorized Natelson to proceed, and Sharts filed the action on December 17, 1984.

On April 3, 1985, while the declaratory judgment action was pending, Sharts wrote Natelson a letter complaining about the course of the litigation. In the letter, Sharts essentially made two admonitory statements. First, Sharts stated that even if he prevailed in the declaratory judgment action, he would sue Natelson for approximately $35,000. Sharts justified this figure as damages resulting from interest payments made while waiting for Natelson to cure "legal errors" he should have corrected two years earlier when he became aware of the problem. Sharts also threatened to sue Natelson for malpractice for approximately $800,000 to $2,000,000 if the declaratory judgment action was unsuccessful. Sharts characterized these damages as direct, provable, and caused by Natelson's carelessness. Sharts also warned that he was bringing to New Mexico very expensive and professional "family" attorneys who were interested in the case.

At his deposition, Sharts testified that he sent the letter to Natelson to "rattle Steve's cage" because he was frustrated with the

slow pace of the litigation and perceived the problem as "foot dragging" on Natelson's part. Sharts also testified that, if he won the declaratory judgment action, he did not intend to sue Natelson for the $35,000. Sharts added that he never contacted the attorneys referred to in his letter.

Despite the threatening letter, Natelson continued to represent Sharts in the declaratory judgment action and in other matters. Sharts testified that he continued to rely on Natelson's counsel and believed that Natelson would ultimately succeed in lifting the cloud from the Tract Two titles. On June 20, 1985, the court entered an order disqualifying Natelson from representing Sharts in the declaratory judgment action because Natelson was a potential witness in the case. The court gave Sharts fifteen days to obtain new counsel.

On July 10, 1985, attorney Daniel Marlowe entered his appearance on behalf of Sharts in the declaratory judgment action. On September 22, 1986, the declaratory judgment action was decided against Sharts, and the three-acre lot restriction was held applicable to Tract Two. This Court affirmed the declaratory judgment in that case on June 14, 1988, in *Sharts v. Walters,* 107 N.M. 414, 759 P.2d 201 (Ct.App.1988). On July 10, 1989, exactly four years after Marlowe entered his formal appearance in the declaratory judgment action, Sharts filed the present legal malpractice action against Natelson.

## II. DISCUSSION

■ We first note the trial court's decision in this case was made within the limitations of a summary judgment motion. *See* SCRA 1986, 1–056. In a motion for summary judgment, the trial court must view the evidence, and construe all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *State v. Integon Indem. Corp.,* 105 N.M. 611, 612, 735 P.2d 528, 529 (1987); *Wheeler v. Board of County Comm'rs,* 74 N.M. 165, 171, 391 P.2d 664, 670

(1964). On appeal, this Court must review the record in the light most favorable to support a trial on the merits. *North v. Public Serv. Co.,* 97 N.M. 406, 408, 640 P.2d 512, 514 (Ct.App.1982); *see also Gaston v. Hartzell,* 89 N.M. 217, 549 P.2d 632 (Ct.App.1976).

### A. New Mexico Statute of Limitations and Attorney Malpractice

■ For breaches of unwritten contracts and torts affecting property, inter alia, the relevant statutory sections prescribe a four-year period of limitation. *See* §§ 37–1–1 and –4. Section 37–1–1 provides, "[t]he following suits or actions may be brought within the time hereinafter limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially provided." Section 37–1–4 provides, "[t]hose founded upon accounts and unwritten contracts; those brought for injuries to property or for the conversion of personal property or for relief upon the ground of fraud, and all other actions not herein otherwise provided for an specified within four years." As noted above, the procedural limitation provided by Sections 37–1–1 and –4, as it relates to legal malpractice, was first discussed by our Supreme Court in *Jaramillo.*

In that case, the defendant attorney (hereinafter "Hood") was accused of negligently drafting and supervising the execution of a will. Shortly after the testatrix's death, the will was admitted to probate. Over the next four years, several different attorneys entered appearances on the plaintiff's behalf. During this time the order admitting the will to probate was set aside nunc pro tunc. Approximately five years after the will had been set aside, the will was finally denied probate, and three years after that, the malpractice action was filed.

*Jaramillo* followed California precedent, abandoned the traditional accrual rule, and adopted a general two-step approach to the question of when a cause of action accrues against an attorney for malpractice.[1] Under

---

1. Although as a general rule, the statute of limitations against an attorney begins to run when the plaintiff discovers or reasonably should have discovered the negligence, the prescription period is tolled where the plaintiff has not suffered harm

in fact. This differs from the traditional liability rule which presumed nominal damages coincided with the occurrence of the attorney's negligent act or omission and the cause of action accrued for statute of limitations purposes at the

the "discovery rule" analysis adopted by the *Jaramillo* Court, a legal malpractice cause of action accrues, for the purposes of the statute of limitations, when (1) the occurrence of harm or loss arises in fact, and (2) the act of negligence out of which the harm complained of is ascertainable and discoverable by the complaining party. *Jaramillo*, 93 N.M. at 434, 601 P.2d at 67 (citing *Budd v. Nixen*, 6 Cal.3d 195, 98 Cal.Rptr. 849, 491 P.2d 433 (1971) and *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 98 Cal. Rptr. 837, 491 P.2d 421 (1971) (en banc)); *see* Annotation, *When Statute of Limitations Begins to Run upon Action Against Attorney for Malpractice*, 32 A.L.R.4th 260 (1984).

The *Jaramillo* Court rejected the date the will was negligently drafted as the date the harm or loss occurred. *Jaramillo*, 93 N.M. at 434, 601 P.2d at 67. The date that the document was negligently drafted did not fix the date of loss because, had the error been detected prior to the death of the testatrix, reformation rather than a malpractice action would have been required. *See* 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 18.18, at 145 (3rd ed. 1989). More importantly, the *Jaramillo* Court found, "[t]he harm or damage in this case arose at the time the testatrix died." *Jaramillo*, 93 N.M. at 434, 601 P.2d at 67; *see also* 2 Ronald E. Mallen & Jeffrey M. Smith, § 18.11 at 102, 106; *Connecticut Junior Republic v. Sharon Hosp.*, 188 Conn. 1, 448 A.2d 190 (1982) (court followed traditional rule and refused to reform a will despite obvious and egregious error); *see generally* 1 William J. Bowe & Douglas J. Parker, *Page on the Law of Wills* §§ 13.7–.8 at 672, 676 (1960).

■ Concluding that, upon the death of the testatrix, the misdrafted will constituted harm or loss in fact, the *Jaramillo* Court held the cause of action *discoverable* thereaf-

ter on the dates that any one of the plaintiff's several new attorneys entered their appearances and when the order admitting the will to probate was set aside. *Jaramillo*, 93 N.M. at 434, 601 P.2d at 67. Despite the sparseness of the *Jaramillo* analysis, we conclude that the quantity of harm or loss in fact that must exist to satisfy the first prong of the *Jaramillo* two-prong test is more than nominal and also greater than the mere existence of an allegedly misdrafted legal document.[2] *See also George v. Caton*, 93 N.M. 370, 377, 600 P.2d 822, 829 (Ct.App.1979) (not every error or mistake at law is a breach of professional duty); *First Nat'l Bank of Clovis v. Diane, Inc.*, 102 N.M. 548, 553, 698 P.2d 5, 10 (Ct.App.1985) (litigation caused by attorney's advice not necessarily a breach of professional duty).

■ Under the two-prong analysis of *Jaramillo*, the parties urge this case presents the question of when, under the first prong of the discovery rule, harm or loss in fact sufficient to accrue the cause of action occurred. Sharts argues his cause of action did not accrue under the *Jaramillo* rule before the adverse ruling in the declaratory judgment action and Natelson argues harm not only existed, but was discovered and already fixed at a minimum, certain value prior to the initiation of the declaratory judgment action and was certainly no longer speculative harm as of the date of the 1985 threatening letter. *See Nosker v. Western Farm Bureau Mut. Ins. Co.*, 81 N.M. 300, 302, 466 P.2d 866, 868 (1970) (recovery precluded only where it is fact of harm rather than extent of harm that is in issue). Under the facts of this case, we agree with Sharts.

### B.  Harm and Injury Contrasted

■ In order to determine the quantity of harm or loss in fact that satisfies the first prong of the *Jaramillo* analysis, we note that

---

time of the occurrence. *See* 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 18.10, at 94 (1989).

**2.**  It is unsettled in the jurisdictions whether there has to be only the fact of harm or whether there needs to be a specific quantity of harm. *See* 2 Ronald E. Mallen & Jeffrey M. Smith, § 18.11 at 103. The underlying authority for *Jaramillo* ini-

tiated a specific quantity requirement, declaring nominal harm insufficient for accrual purposes and adopting an "actual and appreciable" harm standard. *Budd v. Nixen*, 491 P.2d at 436. *Jaramillo* did not expressly adopt language describing the quantum of harm; we note however that the harm or actual loss in *Jaramillo* was irremediable.

useful guidance is found in the discussions of "harm" and "injury" appearing in *Lovelace Medical Center v. Mendez,* 111 N.M. 336, 805 P.2d 603 (1991), and in the Restatement of Torts. While distinguishing the terms "harm" and "injury," the *Lovelace* Court cited Restatement (Second) of Torts § 7(1), at 12 (1965), for the general proposition that "harm" is a definite loss in fact and "injury" is an invasion of a legally protected interest.

■ Accordingly, in the present case, we believe Sharts' "injury" was the alleged negligent drafting of the restrictive covenants by Natelson. Moreover, we believe negligent document drafting by an attorney constitutes an invasion of a client's legally protected interest in professional competence. However, as in *Jaramillo,* the harm or loss in fact which flowed from the alleged negligent document drafting did not trigger the statute of limitations at that time.[3] *Jaramillo* and its underlying authority teaches that an invasion of a legally protected interest (an injury), without actual loss (harm), is insufficient to accrue a cause of action in legal malpractice for purposes of Section 37–1–4. *See also* W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 30, at 143–44 (5th ed. 1984) (negligence action developed out of old action on the case and rule of that action required harm in fact be proved); *but see Budd v. Nixen,* 491 P.2d at 436 (cause of action arises before client suffers all or even the greater part of the harm caused by attorney malpractice).

Under the facts of this case, we believe that until the time of the adverse declaratory judgment action, Sharts' rights were not diminished under the law, only challenged. In other words, the full benefit of the proposed real estate development still remained available and no legal action constrained its advancement. However, at the time of the adverse ruling in the declaratory judgment action, Sharts' legal entitlement to develop his land in the manner he had intended was severely diminished if not completely lost. *See Aragon & McCoy v. Albuquerque Nat'l Bank,* 99 N.M. 420, 424, 659 P.2d 306, 310 (1983) (trial court ruling reducing approval to build dwelling units from 287 units to 83 units is clear "occurrence resulting in loss" and marks the latest date upon which the cause of action could accrue under Tort Claims Act); *Chisholm v. Scott,* 86 N.M. 707, 526 P.2d 1300 (Ct.App.1974) (cause of action in professional negligence accrued at time *legal* liability materialized under contract); *see also First Nat'l Bank of Clovis v. Diane, Inc.*

### C. Occurrence Resulting in Loss under the Tort Claims Act

In *Aragon & McCoy,* our Supreme Court considered the question of when an "occurrence resulting in loss" is sufficient to accrue a cause of action under the Tort Claims Act, NMSA 1978, §§ 41–4–1 to –15(A) (Repl. Pamp.1989). That Court said:

> The plain language of the statute indicates that the period of limitations began to run when an "occurrence resulting in loss" took place. Until such a loss took place, the statute of limitations could not begin to run.

> Like the trial court, we agree that the date of accrual could have begun on several dates when Aragon suffered loss or injury. In October 1976, the neighbors filed suit which eventually resulted in the invalidation of Aragon's site development plan. On February 3, 1977, Aragon's application for a Phase II building permit was denied. Aragon submits that injury or loss occurred when the Supreme Court ruled on March 31, 1978. In our opinion, the very last event which might be characterized as a loss or injury was the district court's February 8, 1977 order which vacated the 1972 decision approving the construction of 287 dwelling units. As a result of this order, Aragon's approval to build dwelling units was reduced in number from 287 to 83 units. In our view, this is a clear "occurrence resulting in loss" and thus marks the last date on which the statute could have begun to accrue.

---

3. *See also* 2 Ronald E. Mallen & Jeffrey M. Smith, § 18.11, at 106 and 107. Whether a defect in title causes harm only if and when challenged by an adverse claimant has been inconsistently treated in the courts. *See Succession of LaSalle v. Clark,* 503 So.2d 694 (La.App. 1987) *cert. denied,* 505 So.2d 1146 (1987); *Graham v. Holler,* 499 So.2d 62 (Fla.App.1986).

*Aragon v. McCoy,* 99 N.M. at 424–25, 659 P.2d at 310–11.

The quotation illuminates several points. First, where the issue turned on the legal significance of an action or document, the Court clearly rejected the completion of the appellate process as necessary to mark an "occurrence resulting in loss." Second, the Court apparently embraced the policy of relying on the latest rather than the earliest possible event which might begin the running of the limitation period. And third, the Court clearly distinguished the trial court determination of the rights of the parties from the other events that appear to be occurrences resulting in loss. We employ analogous reasoning to the present case and now turn to the events cited by the parties as dispositive to the statutory limitation issue.

## III. ACCRUAL OF THE CAUSE OF ACTION AS A MATTER OF LAW

### A. Sharts' Threatening Letter

Natelson contends that the statute of limitations began to run as a matter of law when Sharts sent the April 3, 1985, threatening letter. Natelson argues that Sharts' letter demonstrates he had irremediable business losses of at least $35,000. Natelson further argues that, although Sharts did not know the full extent of the harm, he knew Natelson's carelessness could cost him approximately $800,000 to $2,000,000.

However, we believe Natelson's reliance on Sharts' threat of a $35,000 lawsuit is misplaced. First, Sharts' sworn testimony indicates that his threat related only to his frustration over the pace of the declaratory judgment action, his perception that Natelson was foot-dragging, and the interest costs that were resulting from the delay. The statements indicate that Sharts may have been harmed as a result of Natelson's slow pace in litigation. Moreover, harm or loss in fact as a result of Natelson's pace of work is distinguishable from the harm or loss in fact resulting from Natelson's negligent drafting of the restrictive covenants. It is true that Sharts' reference to "legal errors" could refer to negligent draftsmanship involving the covenants. However, the reference could also be to the "legal errors" other attorneys

had made in interpreting the covenants or to Natelson's pace of correcting the problem. Thus, according to the law controlling this appeal and given the conflicting inferences that can be made from the evidence, the issue should be decided in Sharts' favor at the summary judgment stage.

Natelson's reliance on Sharts' threat of a larger malpractice suit is similarly misplaced. Sharts' threat was explicitly conditioned on whether Natelson was successful in the declaratory judgment action. At his deposition, Sharts testified that he still believed in Natelson and believed that Natelson could lift the cloud from the title of his property. Therefore, because this evidence is also controverted, summary judgment would be inappropriate. *See Eoff v. Forrest,* 109 N.M. 695, 699, 789 P.2d 1262, 1266 (1990); *Koenig v. Perez,* 104 N.M. 664, 666, 726 P.2d 341, 343 (1986) (substantial dispute as to a material fact forecloses summary judgment).

Natelson also contends that the threat of legal action by other attorneys concerning the application of the covenants to Tract Two demonstrates that Sharts knew or should have known that Natelson committed malpractice and, as a result, harmed Sharts. However, Natelson's reliance on notice to Sharts from legal counsel obtained by the owners of lots in Tract One that the covenants may have a meaning contrary to that held by Sharts is mistaken. Even a properly prepared set of covenants cannot prevent a party from challenging the application of the covenants under particular circumstances. *See Farner v. Fireman's Fund Ins. Co.,* 748 F.2d 551, 555 (10th Cir.1984). To the extent that such threats put Sharts on notice of anything other than a potential dispute, on the facts of this case, are insufficient to begin the running of the limitation period as a matter of law.

### B. Entry Date of Attorney Marlowe

Natelson next contends that Sharts' cause of action accrued, as a matter of law, the date attorney Marlowe entered an appearance on behalf of Sharts in the declaratory judgment action because Sharts should have known then that he was the victim of legal malprac-

tice. We disagree. Natelson's Brief-in-Chief indicated that he believed the threatening letter satisfied the harm or loss in fact prong of the *Jaramillo* test and that the Marlowe entry date argument was offered to satisfy the discovery prong. *See Jaramillo.* However, as we noted above, we do not believe Sharts' threatening letter satisfied the first prong of the *Jaramillo* test. Therefore, because we resolve this appeal under the harm or loss in fact prong of analysis, reliance on the entry date of appearance of Attorney Marlowe is erroneous because it is meaningless to say that Sharts could have discovered a harm or loss in fact which had not yet accrued.

## C. The Declaratory Judgment Action

In *Sharts v. Walters,* 107 N.M. 414, 759 P.2d 201 (Ct.App.1988), this Court affirmed the September 1986 trial court decision denying Sharts and Natelson their interpretation of the covenants. Sharts' complaint revealed that the declaratory judgment action and other attempts to clear the cloud from the title of the property caused Sharts to incur costs and legal fees more than four years prior to the July 10, 1989, commencement of the present action.

However, it is also clear that during that time it could not yet be determined that these costs were caused by the negligent drafting of the covenants by Natelson rather than a misapprehension on behalf of those asserting the legal rights of the owners in Tract One. Without the underlying ambiguity resolved by a court of competent jurisdiction, we are unwilling to find the challenges to the covenants and Sharts' attempts to resolve the difficulties arising from those challenges as constituting the necessary harm or loss in fact requirement as a matter of law. Moreover, we believe the prima facie causal connection requirement between the costs incurred and the alleged misdrafting of the covenants is inadequate to accrue a cause of action in malpractice in the present case. *See Holland v. Lawless,* 95 N.M. 490, 495, 623 P.2d 1004, 1009 (Ct.App.) (one element of a legal malpractice cause of action is for there to be a reasonable, close causal connection between the conduct and the resulting injury), *cert. denied,* 95 N.M. 593, 624 P.2d 535 (1981).

We are so persuaded for several reasons. First, had Sharts prevailed on the declaratory judgment action, he would not ordinarily be in a position to claim that negligent drafting of the covenants by his attorney was the cause of his alleged costs and business losses and, in the absence of any other proof to the contrary, such losses may be transactional costs of doing business in real estate. *See* Restatement Second of Judgments 2d § 33, cmt. (a) at 332 (1982) (declaratory judgment permits parties to have their rights declared before a claim has accrued; before coercive remedy available).

A second reason why we decline to find this cause of action barred by the statute of limitations is because we do not wish to further encourage legal malpractice litigation when other possible remedies are available. For example, if Sharts had filed an action against Natelson immediately upon receiving the first letter from lot owners in Tract One challenging his interpretation of the covenants, he would have eliminated the opportunity to receive waivers and modifications from the purchasers of lots in Tract One. However, Sharts continued to rely on Natelson's assurances and advice that a solution to this problem could be found. We think this the better course. Our cases do not require, nor does it seem prudent, to encourage the filing of provisional, preemptory legal malpractice actions. *See id.* cmt. (c) at 335 (where litigant seeks declaratory judgment rather than coercive remedy, factual inference may arise that litigant is in quandary as to what his rights are and how to secure their adjudication).

Third, we also note that had Sharts brought his malpractice suit prior to the completion of the declaratory judgment action, he would be in the unenviable position of maintaining in one suit (the declaratory judgment action) that the covenants had been properly drafted, while in the other suit (the malpractice action) that the covenants had been negligently drafted, contrary to his intention and that they did not mean what he had intended. Such sworn testimony could create a legitimate credibility issue preclud-

ing summary judgment. *See* Charles A. Wright, et al., *Federal Practice & Procedure Civil 2d* § 2726, at 113 (1983) (where evidence produced in support of motion for summary judgment creates a credibility issue, summary judgment inappropriate); *see also United States Nat'l Bank of Oregon v. Davies*, 274 Or. 663, 548 P.2d 966 (1976); *St. Paul Fire & Marine Ins. v. Speerstra*, 63 Or.App. 533, 666 P.2d 255 (1983) (inconsistent positions to be avoided).

Accordingly, we hold that until the time of the adverse declaratory judgment ruling in the trial court, whatever costs and delays were incurred as a result of the language in the covenants were insufficient to satisfy the harm or loss in fact prong of the *Jaramillo* analysis as a matter of law.

## V. CONCLUSION

New Mexico cases have long noted the law favors the right of action over the privilege of limitation. *See Gaston v. Hartzell*, 89 N.M. at 220, 549 P.2d at 635. This is particularly so where a statutory bar is invoked on a motion for summary judgment. *See Johnson v. J.S. & H. Constr. Co.*, 81 N.M. 42, 43, 462 P.2d 627, 628 (Ct.App.1969); *Sanders v. Smith*, 83 N.M. 706, 709, 496 P.2d 1102, 1105 (Ct.App.), *cert. denied Rupert v. Sanders* 83 N.M. 698, 496 P.2d 1094 (1972). Further, we take this opportunity to relay the trial judge's comments given at the close of the motion for summary judgment hearing with which we concur:

> I think to interpret [*Jaramillo* ] as [Natelson] urges would be fostering a policy of requiring an individual to obtain other counsel, [and] file an early lawsuit in order to protect [the individual's] rights. I think we need to have a policy which is reflected in interpreting [*Jaramillo* ] whereby an attorney is encouraged to take curative actions to try to avoid any damages. So I'm going to deny the motion for summary judgment because I think there is a genuine question of fact as to whether or not ascertainable damages existed prior to the rendition of the declaratory judgment.

Therefore, we decline to find this cause of action barred by the statute of limitations and affirm the trial court's ruling denying the motion for summary judgment.

**IT IS SO ORDERED.**

APODACA, J., specially concurs.

HARTZ, J., dissents.

APODACA, Judge, specially concurring.

I concur in the result of Judge Alarid's opinion. However, I respectfully disagree with the opinion's proposed analysis of *Jaramillo v. Hood*, 93 N.M. 433, 601 P.2d 66 (1979), and concur with the dissent's analysis on that point. However, unlike the dissent, I conclude that the *latest* date on which the statute of limitations could have begun running as a matter of law was the date on which Plaintiff's new attorney filed his notice of appearance. *See id.* at 434, 601 P.2d at 67 (malpractice reasonably ascertainable each time appellant's new attorneys entered appearances). This date was exactly four years before the date Plaintiff's malpractice suit was filed. If the trier of fact determined this date to be when Plaintiff ascertained the harm stemming from the alleged act of negligence, Plaintiff's cause of action would be deemed filed within the limitations period. However, Plaintiff may have been able to ascertain the harm earlier, and the trier of fact could so determine. For this reason, I conclude that whether the statute of limitations began running more than four years before the malpractice suit was filed is a question of fact. I thus agree that the trial court's order denying summary judgment should be affirmed.

The opinion holds that Plaintiff was harmed and the statute of limitations did not begin to run until the trial court rendered its decision in the declaratory judgment action. I believe that the opinion's focus on this event is incorrect. The parties, for example, focus their argument on when the harm was discoverable or ascertainable. I also generally agree with the dissent's conclusion that the harm occurred when the first lot was sold and the restrictive covenants could no longer be redrafted, not when the trial court rendered its decision. *Cf. id.* (harm occurred at the time the testatrix died). I also agree that Plaintiff began to incur damages as soon

as the proposed development was hindered and Plaintiff incurred expenses trying to clear the cloud on the title. For these reasons, I agree with the dissent's conclusion that the harm could have been discovered or ascertained before the trial court rendered its decision in the declaratory judgment action.

Two other important policy considerations also militate against holding that Plaintiff did not have a cause of action for malpractice until the trial court rendered its adverse decision. First, because there is always the possibility that the decision will be appealed to this Court and then a petition for certiorari to our Supreme Court applied for, an adverse decision is arguably not final until all appellate remedies have been exhausted. This could take considerable time. Second, I believe that a plaintiff could conceivably have a valid cause of action for malpractice (if an attorney has committed an error) even if the underlying litigation was eventually resolved satisfactorily to the plaintiff, even at the trial court level. This would be so because, regardless of the result or disposition of the underlying litigation, the plaintiff would necessarily have had to expend money, time, and effort correcting the problem. In other words, even if the court had ruled in favor of Plaintiff in the original suit, it would not necessarily obviate the fact that the drafting attorney's negligence caused the filing of the lawsuit to clear up the cloud on the title.

However, the dissent would hold that Plaintiff's harm was ascertainable as a matter of law more than four years before Plaintiff filed his malpractice suit. The dissent rests this conclusion on: (1) the fact that Plaintiff admitted retaining his new counsel several days before his new counsel entered an appearance; and (2) the rejection of Plaintiff's argument that the pertinent date is the date new counsel was retained, rather than the date Defendant ceased representing Plaintiff on this matter. I disagree.

"Determination of the timeliness of a claim as a matter of law is only proper if, under the undisputed facts, there is no room for a reasonable difference of opinion." *City of Roswell v. Chavez*, 108 N.M. 608, 611, 775 P.2d 1325, 1328 (Ct.App.), *cert. denied*, 108 N.M. 624, 776 P.2d 846 (1989). Even if the facts are undisputed, "summary judgment should be denied if equally logical but conflicting inferences can be drawn from the facts in favor of the party opposing summary judgment." *Hutcherson v. Dawn Trucking Co.*, 107 N.M. 358, 360, 758 P.2d 308, 310 (Ct.App.1988).

In this appeal, the basic facts (that Plaintiff sent Defendant a threatening letter, that Defendant knew of the dispute over the proper interpretation of the covenants, and that Defendant's new counsel entered an appearance exactly four years before the malpractice suit was filed) are undisputed. However, I believe that these facts lead to different but equally plausible inferences, one of which is that, if Plaintiff is believed, he did not ascertain or discover the malpractice before his new counsel entered his appearance. Even if Plaintiff did consult and retain his new counsel before that counsel entered an appearance on Plaintiff's behalf, I do not believe that, *as a matter of law*, the limitations period began running at that time, as suggested by the dissent. See *Jaramillo*, 93 N.M. at 434, 601 P.2d at 67. Additionally, I agree with Plaintiff that, under *Jaramillo*, the relevant date is when Plaintiff's new counsel entered an appearance, not when Defendant's representation ceased. See *id.* For these reasons, I conclude that there is an issue of fact concerning when the statute of limitations began to run. Consequently, I agree that summary judgment was properly denied.

HARTZ, Judge (dissenting).

I would reverse and remand to require the district court to enter judgment on behalf of Natelson.

I should begin by noting that the lead opinion does not represent the views of the majority of the panel. Both Judge Apodaca and I disagree with the analysis in that opinion. Indeed, although Judge Apodaca and I disagree with respect to the result, we generally agree on the appropriate legal analysis. Our disagreement is largely confined to the application of the continuous representation rule to this case.

Turning to the merits, *Jaramillo v. Hood,* 93 N.M. 433, 601 P.2d 66 (1979), held that a cause of action for attorney malpractice accrues once the malpractice has caused actual loss or damage and the facts necessary to sustain the claim are ascertainable and discoverable by the injured person. Both conditions were satisfied in this case more than four years before the complaint was filed. Therefore, the complaint was barred by the applicable statute of limitations, NMSA 1978, § 37–1–4 (Repl.Pamp.1990). Even were New Mexico to recognize that accrual of a cause of action for attorney malpractice could be delayed under (1) what I shall call the predicate-litigation rule or (2) the continuous representation rule, Sharts would not benefit from either rule unless we were to construe the rule in a manner that departs from its customary application and violates its underlying rationale.

## I. HARM

### A. *New Mexico Precedents*

Judge Alarid's lead opinion rests its conclusion on the proposition that there was no harm or loss until the time of the adverse declaratory judgment ruling by the district court. That view is contrary to our Supreme Court's holding in *Jaramillo.* In that opinion our Supreme Court upheld summary judgment in favor of an attorney sued for alleged negligence in the preparation of a will. The Supreme Court opinion notes a number of potentially significant dates. It mentions that the attorney was employed to prepare a will on April 22, 1967; that the decedent died on October 6, 1967; that the will was admitted to probate on November 22, 1967; that the order admitting the will to probate was set aside *nunc pro tunc* on April 14, 1969; that the will was denied probate on May 28, 1974; and that the complaint for malpractice was filed on May 20, 1977. Only one date was held to be relevant to the determination of loss or damage. The Court ruled that "[t]he harm or damage in this case arose at the time the testatrix died." *Id.* at 434, 601 P.2d at 67.

As I understand *Jaramillo,* the harm occurred at the time of the testatrix's death because that is when the plaintiff's legal rights became fixed. So long as the testatrix was alive, the alleged negligence could have been cured by revising the will. The dates when the court acted with respect to the will were immaterial to the determination of when harm occurred. As stated in *Woodburn v. Turley,* 625 F.2d 589, 592 (5th Cir. 1980) (applying Texas law), "[L]egal injury is complete when the negligence of the defendant attorney results in a diminution of the plaintiff's rights under the law, *not* when that diminution is confirmed by a court...."

Thus, the harm in this case occurred once the alleged negligent drafting by Natelson had irreversible legal consequences. The drafting had irreversible legal consequences when Sharts sold land pursuant to deeds that permitted purchasers to prevent Sharts from subdividing Tract Two into half-acre lots. Until such a sale, Natelson's alleged negligence in preparing the restrictive covenants could have been corrected. That is, prior to such a sale Natelson or some other attorney could have redrafted the covenants and no harm would have been done. After the sale a court could rule on the meaning and application of the covenants but could not change the facts that determined Sharts' legal rights under the covenants.

To be sure, Sharts suffered no financial injury at the time of the first sale of a lot, but neither did the plaintiff in *Jaramillo* suffer a financial injury at the time of the death of the testatrix. What is important in both cases is that the event in question—the sale of the lot or the death of the testatrix—fixed the plaintiff's legal rights. Once the first lot was sold, Sharts suffered harm because his other property was subject to an unwanted restriction. *Jaramillo* did not express any interest in when the plaintiff in that case had suffered any financial loss. But if that is a concern, in this case Sharts suffered financial loss more than four years before filing suit. The problem with the covenants prepared by Natelson required Sharts to incur various legal expenses to try to correct the problem, *see Kovacevich v. Wainwright,* 16 Cal.App. 4th 337, 19 Cal.Rptr.2d 692 (Ct.App.1993) (actual injury occurred when plaintiff compelled to incur legal costs); *Grunwald v. Bronkesh,* 131 N.J. 483, 621 A.2d 459, 465

(1993) (in determining when cause of action for attorney malpractice accrues, actual damage may consist of attorney's fees), and the delay to the planned development caused Sharts to suffer substantial financial losses, such as having to pay additional interest charges.

Contrary to the reasoning in the lead opinion, *Jaramillo* clearly rejects the view that harm from the negligent drafting of a document cannot occur until a court has construed the document. *Jaramillo* held that the limitations period had commenced prior to the time that the improperly drafted will was denied probate. (The will was denied probate on May 28, 1974; suit was filed on May 20, 1977; yet the court held that the four-year statute-of-limitations period had expired.) It is noteworthy that the appellate brief-in-chief of the losing plaintiff in *Jaramillo* made the argument seemingly adopted by the lead opinion in this case. The brief contended:

> Beneficiaries under the will had no dispute with defendant-attorney until such time as they were denied recovery under the will.... [I]t would be premature for a disclosed beneficiary to file an action against the attorney to protect his bequest on grounds that provisions of the will *may* fail and that probate *may* take longer than the four year statute of limitations. It is not the policy of the courts to promote such premature suits.

The reliance of the lead opinion on three other New Mexico decisions is misplaced. *Chisholm v. Scott*, 86 N.M. 707, 526 P.2d 1300 (1974), is a Court of Appeals decision that predates *Jaramillo;* it certainly cannot be read as limiting *Jaramillo. First National Bank v. Diane, Inc.*, 102 N.M. 548, 698 P.2d 5 (1985), is a Court of Appeals decision that appears to have no relevance to the issues in this appeal; it discusses the standard of care, not the statute of limitations. As for *Aragon & McCoy v. Albuquerque National Bank*, 99 N.M. 420, 659 P.2d 306 (1983), the Supreme Court simply held that the limitations period under New Mexico's Tort Claims Act had expired because the very last possible date that one might argue was the date of loss was a date more than

two years before the claim was filed. The *holding* in *Aragon & McCoy* on this point is that the limitations period certainly begins before an appellate court ruling on the issue. This holding appears inconsistent with the statement of law in the lead opinion. If, as the lead opinion states, harm does not occur until legal rights are settled, I would think that no harm occurs until the final appellate decision.

### B. *The Predicate–Litigation Rule*

On the issue of harm there remains for discussion only those decisions in other jurisdictions which at first glance may appear to support the approach of the lead opinion. Some courts have stated in certain circumstances that a cause of action for attorney malpractice did not accrue until the termination of related litigation. *See, e.g., Laird v. Blacker*, 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691 (1992) (en banc). This rule properly applies only when the related litigation is the litigation in which the alleged malpractice was committed, which I shall term the "predicate litigation." Thus, I would call the rule the "predicate-litigation rule." It may make sense to say that no harm or damage has occurred until the predicate litigation has been concluded. Every attorney makes some mistakes during litigation and some of those mistakes may well be malpractice, but often the result is not affected by the error. For example, a party may win a lawsuit despite incompetent cross-examination conducted by the party's attorney.

The following passages from 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 18.11 (3d ed. 1989), explain that the time at which harm occurs does not depend on the outcome of litigation unless the alleged malpractice was committed during the litigation.

> [A] right or a remedy is usually lost, or a liability is imposed at the time of a lawyer's error even though a court does not so declare until a later date. Although the unpredictability in resolution through the judicial process may excuse discovery of the injury, such a determination of rights and liability does not "create" the damage. For example, an injury to title exists when

the lawyer erred, even though the client seeks to litigate what ultimately proves to be a meritorious claim of the adverse party.

*Id.* at 108 (footnotes omitted).

The date of injury is when the right is lost or the liability is imposed. For example, a California lawyer was sued for an error in 1974 in preparing a marital property settlement agreement which failed to protect his client's interest in her former husband's military pension. Although the client claimed that she did not sustain any damage until 1979 when her former spouse's right to receive the pension vested, the court held that whatever right she had was lost in 1974, regardless of the contingent nature of that interest. Similarly, a Georgia decision held that an unfavorable property separation agreement caused damage when it was signed as a binding obligation, not when it was later incorporated into the divorce decree.

*Id.* at 109 (footnotes omitted).

A situation to be distinguished is where the error which causes the damage occurs within the judicial proceeding itself. Then, the judicial process does not declare the rights and liabilities of the parties, but rather is the situs of the client's injury to a cause of action or a defense. Since subsequent effects usually determine the economic consequence of the error, the time of the injury is when the judicial action is completed, typically upon the entry of an order or judgment.

*Id.* at 110 (footnote omitted). Recognizing the distinction between predicate litigation and other related litigation is *Arizona Management Corp. v. Kallof,* 142 Ariz. 64, 688 P.2d 710, 714 (Ct.App.1984) (distinguishing *Amfac Distrib. Corp. v. Miller,* 138 Ariz. 155, 673 P.2d 795, *approved as supplemented,* 138 Ariz. 152, 673 P.2d 792 (1983), as limited to malpractice occurring during litigation). *See Graham v. Holler,* 499 So.2d 62 (Fla.Dist.Ct. App.1986) (distinguishing *Richards Enterprises v. Swofford,* 495 So.2d 1210 (Fla.Dist. Ct.App.1986)); *Grunwald v. Bronkesh,* 621 A.2d at 465; *Magnuson v. Lake,* 78 Or.App. 620, 717 P.2d 1216 (1986); *Zidell v. Bird,* 692 S.W.2d 550, 557 (Tex.Ct.App.1985); *see also*

*Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple,* 394 Mass. 265, 475 N.E.2d 390 (1985).

The contrary authority is rather limited. Some Kansas decisions could be read as applying the predicate-litigation rule even when the alleged malpractice was not committed in the related litigation, but the Kansas Supreme Court now appears to have rejected the view that harm cannot occur until the conclusion of related litigation. *See Dearborn Animal Clinic v. Wilson,* 248 Kan. 257, 806 P.2d 997 (1991) (treating related litigation as being relevant to discoverability rather than harm). In any event, Kansas cases are not good authority in New Mexico because they follow *Price v. Holmes,* 198 Kan. 100, 422 P.2d 976 (1967), which held that a cause of action for malpractice in preparing a will accrued only after the will was declared invalid, a result contrary to *Jaramillo.* Occasionally other courts also fail to distinguish between predicate litigation and other related litigation. This error was made, for example, in *Grunwald v. Bronkesh,* 254 N.J.Super. 530, 604 A.2d 126, 130 (Ct.App.Div.1992), *rev'd,* 131 N.J. 483, 621 A.2d 459 (1993). All but one of the decisions upon which the New Jersey Appellate Division relied involved predicate litigation. That one decision, *Haghayegh v. Clark,* 520 So.2d 58 (Fla.Dist. Ct.App.1988), had itself relied on decisions involving predicate litigation in erroneously applying the rule to other related litigation. Moreover, as noted above, Florida appellate courts do not all agree with *Haghayegh. See Graham v. Holler.* This Court should not follow the few cases that have mechanically applied the predicate-litigation rule to other related litigation without examining the rationale of the rule.

Finally, I see no public policy reason to hold that no harm occurs until the resolution of related litigation that is not the predicate litigation. My review of statutes in other jurisdictions reveals that New Mexico's four-year limitations period is one of the longer in the country for attorney malpractice actions, and reportedly New Mexico has one of the faster dockets in the country. Ordinarily, if the person alleging legal malpractice thought that it would cause problems to file suit

before related litigation had been decided, there would still be ample time to resolve the related litigation before the limitations period expired in the malpractice action. For example, in this case the related litigation was the declaratory judgment action. Judgment was entered less than two years after the complaint for declaratory judgment was filed.

Moreover, even if our limitations period were shorter or our docket slower, the public policy argument for delaying accrual of the cause of action is a weak one. If the very act of filing a complaint for attorney malpractice would prejudice the plaintiff in litigation regarding the effect of the work of the sued attorney (a proposition that I question, *see Grunwald*, 621 A.2d at 466–67), it would generally be in the interest of the allegedly negligent attorney as well as the plaintiff to enter into an agreement tolling the statute of limitations. Also, one must not totally ignore the interests of the accused attorney, whose ability to prepare a defense will diminish with the passage of time. It is the attorney's interest in repose that is protected by the statute of limitations. *See id.*, 621 A.2d at 465–66 (permitting tardy commencement of malpractice claim "would frustrate the purposes of limitations periods: to protect against the litigation of stale claims; to stimulate litigants to prosecute their claims diligently; and to penalize dilatoriness.") Of course, plaintiffs too may not always favor the rule set forth in the lead opinion because it delays when a plaintiff is permitted to file a claim—in the absence of harm a plaintiff, having no cause of action, cannot file suit even if such a course seems desirable.

## II. DISCOVERY

### A. *General Rule*

The second requirement stated in *Jaramillo* for accrual of a cause of action is that the matters complained of be "ascertainable and discoverable by the injured person." 93 N.M. at 434, 601 P.2d at 67. For that proposition *Jaramillo* cites *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 98 Cal.Rptr. 837, 491 P.2d 421 (1971) (en banc). The specific holding in *Neel* was that "in an action for professional malpractice against an attorney, the cause of action does not accrue until the plaintiff knows, or should know, all material facts essential to show the elements of that cause of action." *Id.*, 491 P.2d at 430.

It is not necessary that the client have the expertise to judge whether the attorney acted beneath the standard of professional care, so long as the pertinent facts are available to the client. This is the general rule with regard to the discovery requirement for the accrual of causes of action for professional malpractice. Thus, in medical malpractice litigation the California Supreme Court has adopted the view that " 'when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation ... the statute commences to run,' " *Sanchez v. South Hoover Hosp.,* 18 Cal.3d 93, 132 Cal. Rptr. 657, 553 P.2d 1129, 1135 (1976) (quoting 2 *Witkin,* Cal.Procedure (2d ed. 1970) Actions § 339, p. 1181 (emphasis deleted)). Similarly, federal courts have stated, " '[W]hen the facts [become] so grave as to alert a reasonable person that there may have been negligence related to the treatment received, the statute of limitations [begins] to run against the appellant's cause of action.' " *Sanders v. United States,* 551 F.2d 458, 460 (D.C.Cir.1977) (quoting *Reilly v. United States,* 513 F.2d 147, 150 (8th Cir. 1975)). In the specific context of legal malpractice the New Jersey Supreme Court wrote:

> [T]he discovery rule ... postpone[s] the accrual of a cause of action when a plaintiff does not and cannot know the facts that constitute an actionable claim.
>
> ... The limitations period begins to run when a plaintiff knows or should know the facts underlying those elements [injury and fault], not necessarily when a plaintiff learns the legal effect of those facts.

*Grunwald v. Bronkesh,* 621 A.2d at 463 (citations omitted).

There is no genuine issue of material fact with regard to whether the essential facts of Sharts' claim were discoverable and ascertainable by Sharts prior to July 10, 1985. Sharts predicates his cause of action on the

contention that he requested Natelson to draft restrictive covenants only for Tract One of the sixty-acre property. Natelson's failure to handle properly the alleged assignment was clearly ascertainable by Sharts well before July 10, 1985. In 1981 Sharts had received a letter from an attorney contending that the covenants affected all 60 acres of Tracts One and Two. Other attorneys challenged Sharts' development of Tract Two in a 1983 letter. Also in 1983, a title company had informed Sharts that the restrictions applied to all 60 acres. In 1984 Sharts had even brought a declaratory judgment to attempt to remove the cloud from his title to Tract Two. Any reasonable person could infer from these events that Natelson had not handled the covenants in a manner to avoid nonfrivolous claims that Tract Two was restricted by the covenants. *See Levine v. Diamanthuset, Inc.*, 722 F.Supp. 579, 590 (N.D.Cal.1989) (cause of action arose when plaintiffs had notice of their investment problems and the consequent legal issues because attorney general had filed suit). On April 3, 1985, Sharts wrote Natelson the following letter:

> This letter is to inform you that if you can get a **DECLARATORY JUDEGEMENT** [sic] in my favor, I'm only going to sue you for approximately $35,000 which represents the extent of the damages I've suffered so far, in the form of interest payments I've had to pay *while waiting for you* to correct the *legal errors* you should have corrected two years ago when you were made aware of them.
>
> *If you lose,* the Declaratory Judgement to set the record straight, I intend to bring a MALPRACTICE SUIT against Natelson and Ross for a minimum of $800,000 to $2,000,000 which represents the direct and provable damages you have caused me by your *carelessness.*
>
> I am bringing to New Mexico some very expensive and very professional "family" attornies [sic] who are interested in the case.

The letter noted that copies were being sent to ten persons, including one titled "Esq." Thus, it is not surprising that Sharts' answer brief acknowledges that by April 3, 1985, he "was aware that Natelson may have been careless in drafting and recording the original restrictive covenants." Sharts does not claim that he was unaware of any pertinent facts.

As for damages, by July 9, 1985, Sharts knew that there was a cloud on his title and that the cloud at the least had delayed development of his property and had required him to incur attorney's fees for the declaratory judgment action and related activity. Sharts' letter to Natelson of April 3, 1985, demonstrated knowledge of serious consequences to Sharts arising from the problems with the covenants. He knew that he had suffered actual damages. The discovery rule is not designed to protect persons as aware of the essential facts as Sharts was. *See Grunwald,* 621 A.2d at 463.

### B. *Was Discoverability Delayed—*

In his Answer Brief Sharts advances two reasons why his cause of action was not discoverable before July 10, 1985.

### 1. Until Conclusion of the Declaratory Judgment Action?

First, he argues that his damages were not ascertainable until the conclusion of the declaratory judgment action. But, as already pointed out, even eventual victory in the declaratory judgment action would not eliminate the damages suffered by Sharts as a result of the problems with the covenants. *See Laird v. Blacker,* 828 P.2d at 696. Sharts would still have incurred attorney's fees in trying to clear the cloud to his title, as well as losses from delay in the project. A cause of action accrues even when the full extent of damages is uncertain. *See Grunwald,* 621 A.2d at 465; Mallen & Smith, *supra,* § 18.11, at 105 & (3d ed. Supp.1992), at 22; *cf. Whittenberg v. Graves Oil & Butane Co.,* 113 N.M. 450, 453, 827 P.2d 838, 841 (Ct.App.1991), *cert. denied,* 113 N.M. 352, 826 P.2d 573 (1992) (similar rule in workers' compensation context).

### 2. Under the Continuous Representation Rule?

Second, Sharts contends that discoverability of his cause of action was delayed by his

reliance on Natelson as his attorney, and therefore the malpractice cause of action was not discoverable and ascertainable until Sharts' new counsel filed his entry of appearance on July 10, 1985, exactly four years prior to the time that Sharts filed his complaint against Natelson. As I understand Judge Apodaca's opinion, this is the one issue on which he and I differ.

I would reject Sharts' argument on this point on both the facts and the law. Even adopting Sharts' view of the law, the undisputed facts in the record establish that Sharts acquired new counsel prior to July 10, 1985. On June 20, 1985, the district court in the declaratory judgment action had entered an order halting Natelson's representation of Sharts in the case and requiring Sharts to secure new counsel within 15 days. Sharts' new attorney entered an appearance in court on July 10, 1985. At his deposition Sharts answered "Yes" when asked, "And seeing that Mr. Marlowe noted his entry as your attorney in court on July 10, 1985, you can be sure, can you not, that you had engaged him to represent you some days before that?"

More importantly, I disagree with Sharts' view that the pertinent date is when Sharts obtained new counsel, as opposed to the date that Natelson stopped representing Sharts on the matter. A number of courts have adopted the rule that a client's cause of action for attorney malpractice does not accrue during the time that the attorney continues to represent the client on the subject matter of the malpractice action. *See* Mallen & Smith, *supra*, § 18.12. The rule is generally referred to as the "continuous representation rule." *See id.* "The purpose of the continuous representation rule is to avoid unnecessarily disrupting the attorney-client relationship." *Id.* at 115. The purpose disappears when the representation ends. *See Glamm v. Allen,* 57 N.Y.2d 87, 453 N.Y.S.2d 674, 677, 439 N.E.2d 390, 393 (1982). Often, of course, the ending of representation by one attorney and the commencement of representation by another attorney are virtually simultaneous. But when they are not, it follows from the rationale for the continuous representation rule that the limitations period is not further delayed once the original

attorney stops representing the client. *See Laird v. Blacker,* 828 P.2d at 693 n. 3 (California's codification of continuous representation rule tolls limitation period until attorney no longer represents plaintiff); *cf. Hensley v. Caietti,* 13 Cal.App. 4th 1165, 16 Cal.Rptr.2d 837 (1993) (tolling under continuous representation rule ended when plaintiff obtained new counsel, although defendant attorney not yet discharged). "[A]n attorney's services are discontinued, for purposes of the statute of limitations, when the client or the court discharges the attorney." *Hooper v. Lewis,* 191 Mich.App. 312, 477 N.W.2d 114, 116 (1991) (applying Michigan statute). Thus, in this case any tolling under the continuous representation rule terminated by June 20, 1985, the date of the court order halting Natelson's representation of Sharts.

Sharts contends that he could not discover his cause of action while Natelson was representing him because of Natelson's influence over Sharts, at least with respect to this matter. That obstacle to discovery ended, however, when the district court ordered Natelson to stop representing Sharts in the case. The point is not that a former client will necessarily discover the cause of action the day after the negligent attorney quits representing the client (immediate actual discovery is unlikely even if a new attorney is retained simultaneously with discharge of the negligent attorney); the point is that once the representation ends, an otherwise discoverable cause of action becomes discoverable. The former client then has the entire limitations period to file suit. If New Mexico adopts the continuous representation rule as it is understood in other jurisdictions, Sharts would still have had four years after June 20, 1985, to file his claim. With that generous limitations period there is no reason for New Mexico to extend the period beyond what could be justified by the rationale for the continuous representation rule.

Moreover, in the circumstances of this case the continuous representation rule has no application. The letter from Sharts to Natelson of April 3, 1985, threatening to sue Natelson for malpractice, demonstrates that, regardless of the sincerity of the letter, Natelson did not need the protection of the contin-

uous representation rule—he was definitely not intimidated by or overly deferential toward his attorney. *See Cantu v. St. Paul Cos.*, 401 Mass. 53, 514 N.E.2d 666, 669 (1987) ("The innocent reliance which the continued representation doctrine seeks to protect is not raised by the facts in this case[.]")

## IV. CONCLUSION

In summary, under the holding in *Jaramillo* the limitations period had expired prior to the time Sharts filed his lawsuit. The great weight of authority argues against extending the limitations period by holding that the cause of action did not accrue until the declaratory judgment litigation had terminated or until Sharts acquired a new attorney after the district court discharged Natelson. In a state which has adopted the discovery rule and provides a generous four-year limitations period, there is no reason for the court to struggle to preserve this tardy complaint.